## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| DAWN M. DEUTSCH and RICK S. DEUTSCH, <br><br>     Plaintiffs, <br><br>     v. <br><br> NEWREZ LLC d/b/a SHELLPOINT MORTGAGE SERVICING, EXPERIAN INFORMATION SOLUTIONS, INC., EQUIFAX INFORMATION SERVICES, LLC, and TRANS UNION, LLC <br><br>     Defendants. | Case No. 1:22-cv-05995 |

## COMPLAINT

**NOW COME** DAWN M. DEUTSCH ("Dawn") and RICK S. DEUTSCH ("Rick") (collectively, "Plaintiffs"), by and through their undersigned counsel, complaining of the Defendants NEWREZ LLC d/b/a SHELLPOINT MORTGAGE SERVICING ("Shellpoint"), EXPERIAN INFORMATION SOLUTIONS, INC. ("Experian"), EQUIFAX INFORMATION SERVICES, LLC ("Equifax"), and TRANS UNION, LLC ("Trans Union"), as follows:

## NATURE OF THE ACTION

1.    Plaintiffs bring this action seeking redress for breach of contract, violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq*., violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681 *et seq., violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §2601 *et seq*., and violations of the Truth in Lending Act ("TILA"), 15 U.S.C. §1639 *et seq.*

2.    Plaintiffs' claims arise from Shellpoint's chronic mishandling of Plaintiffs' mortgage loan. As set forth herein, Shellpoint has terrorized Plaintiffs for years by recklessly

1

deeming Plaintiffs' mortgage loan in default despite Plaintiffs having made each and every principal and interest payment required by their mortgage loan. Despite receiving repeated notices from Plaintiffs regarding its errors, Shellpoint has and continues to ignore Plaintiffs' desperate pleas. Instead of correcting its errors, Shellpoint continues to erroneously deem Plaintiffs' mortgage loan in default and has implicitly threatened to foreclose on Plaintiffs' family home. Moreover, Shellpoint has destroyed Plaintiffs' credit scores by falsely reporting their mortgage loan as past due to the credit reporting agencies.

<u>**JURISDICTION AND VENUE**</u>

3.     The Court has federal question jurisdiction pursuant to 28 U.S.C. §§1331 as the FCRA, RESPA, and TILA are federal statutes.

4.     The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

5.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) because all of the events or omissions giving rise to Plaintiffs' claims occurred within this judicial district.

<u>**PARTIES**</u>

6.     Plaintiffs are natural persons over 18-years-of-age who, at all times relevant, owned and resided at the property located at 462 Forestway Drive, Buffalo Grove, Illinois ("Property").

7.     Shellpoint is a prominent mortgage servicer that services mortgage loans nationwide, including mortgage loans issued to Illinois consumers. Shellpoint maintains its principal of place of business in Greenville, South Carolina. Shellpoint does business in Illinois and is registered with the Illinois Secretary of State.

8.     Experian is a credit reporting agency that is in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing

consumer reports and credit files to third parties bearing on a consumer's creditworthiness, credit standing, and credit capacity. Experian maintains its principal place of business in Costa Mesa, California.

9.      Equifax is a credit reporting agency that is in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports and credit files to third parties bearing on a consumer's creditworthiness, credit standing, and credit capacity. Equifax maintains its principal place of business in Atlanta, Georgia.

10.     Trans Union is a credit reporting agency that is in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports and credit files to third parties bearing on a consumer's credit worthiness, credit standing, and credit capacity. Trans Union maintains its principal place of business in Chicago, Illinois.

11.     Experian, Equifax, and Trans Union (collectively, "the CRA Defendants" or "CRAs") are the three most prominent credit reporting agencies in the United States. Accordingly, the credit and lending industry heavily rely on the information provided by the CRA Defendants in their lending decisions.

## **FACTUAL ALLEGATIONS**

12.     On May 31, 2006, Plaintiffs obtained a home equity line of credit ("Original Loan") with a credit limit of $245,000.00 from Harris, N.A. ("Harris"). *See* Exhibit A attached hereto.

13.     The Original Loan was secured by a mortgage on the Property ("Mortgage"). *See* Exhibit B attached hereto.

14.     At all times relevant, the Property served as Plaintiffs' principal residence.

15.    Pursuant to the terms of the Original Loan, Plaintiffs were obligated to make monthly interest charges, as determined by the "periodic rate," for 119 months, at which time the Loan matures and a balloon payment for the balance would become due.

16.    Pursuant to the terms of the Original Loan, the maturity date was June 5, 2016.

17.    The Original Loan was originally an adjustable rate loan and therefore the monthly payments adjusted with relevant market rates.

18.    At the time Plaintiffs obtained the Original Loan, the monthly interest rate was 7.75%.

19.    Pursuant to the terms of the Original Loan, Plaintiffs were obligated to make the bi-annual real estate tax payments directly to Cook County.

20.    Pursuant to the terms of the Original Loan, Plaintiffs were obligated to maintain insurance on the Property.

21.    On July 19, 2016, Plaintiff and BMO Harris Bank N.A. f/k/a Harris entered in to a "Change in Terms Agreement" ("Loan") which modified the terms of the Original Loan as follows: (1) extended the maturity date to July 19, 2046; (2) locked the interest rate at 3.48%; and (3) modified the monthly payment amount to a "fixed amount of $1,081.85." *See* Exhibit C attached hereto.

22.    Pursuant to the terms of the Loan, "payments will be applied first to any accrued unpaid interest; than to principal; then to any late charges; and then to any unpaid collection costs." *Id.*

23.    The principal balance for the Loan was $241,514.70.

24.    The Loan effectively changed the Original Loan from a line of credit to a conventional loan.

4

25.     Importantly, the Loan and Mortgage did not explicitly authorize the mortgagee to open an escrow account.

26.     On June 20, 2019, Shellpoint began servicing the Loan.

27.     At no point in time prior to June 20, 2019 were the Original Loan or Loan escrowed loans.

28.     At the time Shellpoint began servicing the Loan, Plaintiffs were contractually current on the payments on the Loan and the Loan was not in default.

29.     At the time Shellpoint began servicing the Loan, Plaintiffs maintained property insurance on the subject property.

30.     At the time Shellpoint began servicing the Loan, Plaintiffs were current on the real estate tax payments for the Property.

31.     At the time Shellpoint began servicing the Loan, the balance on the Loan was approximately $218,848.44.

32.     At the time Shellpoint began servicing the Loan, the monthly payment on the Loan was $1,081.85 per the express terms of the Loan.

33.     Shortly after Shellpoint began servicing the Loan, Shellpoint began committing servicing errors.

34.     Specifically, Shellpoint began to deem the Loan in default Loan despite receiving full and timely payments from Plaintiffs.

35.     On April 24, 2020, without *any* notice to Plaintiffs, Shellpoint unilaterally paid the first installment of the 2019 real estate taxes in the amount of $6,486.32 to Cook County.

36.     Shortly after paying the first installment of the real estate taxes, Shellpoint falsely advised Plaintiffs that Shellpoint paid the real estate taxes on behalf of Plaintiffs because Cook

County sent a correspondence to Shellpoint notifying Shellpoint that the real estate taxes were past due.

37.     As a result of Shellpoint's unilateral payment of the real estate taxes, Shellpoint, without *any* notice to Plaintiffs, opened an escrow account for the Loan.

38.     As soon as Plaintiffs discovered that Shellpoint erroneously opened an escrow account for the Loan, Plaintiffs repeatedly contacted Shellpoint via phone and (1) offered to pay Shellpoint for the real estate taxes it paid on Plaintiffs' behalf; and (2) requested that Shellpoint close the escrow account.

39.     In response, Shellpoint gave Plaintiffs the run-around and did not close the escrow account.

40.     On July 15, 2020, without any notice to Plaintiffs, Shellpoint unilaterally paid the second installment of the 2019 real estate taxes in the amount of $3,656.76 to Cook County, *prior* to the due date.[1]

41.     After Shellpoint erroneously opened the escrow account, it began to send monthly statements to Plaintiffs seeking inflated amounts.

42.     For example, in July 2020, Shellpoint sent Plaintiffs a mortgage statement indicating that a minimum payment in the amount of $1,152.57 was due on or before August 19, 2020.

43.     On August 6, 2020, Plaintiffs made a payment in the amount of $1,250.00 to Shellpoint.

---

[1] As part of its COVID-19 Relief initiative, Cook County extended the deadline for the second installment from August 3, 2020 to October 1, 2020.

44.     In August 2020, after receiving the August 6, 2020 payment in the amount of $1,250.00, Shellpoint sent Plaintiffs a mortgage statement demanding a minimum payment of $2,945.40, nearly triple the monthly payment required by the Loan.

45.     Upon information and belief, Shellpoint began holding Plaintiffs' payments in a suspense account and then applying Plaintiffs' payments to the escrow account that was opened by Shellpoint without a factual or contractual basis.

46.     As a result, the vast majority of Plaintiffs' payments were not being applied to principal and interest as they should have been pursuant to the terms of the Loan.

47.     Upon information and belief, Shellpoint increased the minimum monthly payment due as a result of its misapplication of payments as described above.

48.     From July 2020 through early 2021, as a result of Shellpoint's erroneous opening of the escrow account and misapplication of payments, Shellpoint repeatedly sent Plaintiffs mortgage statements falsely alleging a default when in fact Plaintiffs were contractually current on the principal and interest payments that became due pursuant to the terms of the Loan.

49.     From July 2020 through April 2021, Plaintiffs notified Shellpoint of its servicing errors on no less than a dozen occasions via written correspondences and telephone calls.

50.     Specifically, Plaintiffs spent no less than 40 hours on the phone with Shellpoint attempting to persuade Shellpoint to fix its servicing errors (erroneous opening of escrow account, erroneous default notices, and misapplication of payments).

51.     Despite being repeatedly notified of its servicing errors, Shellpoint failed to conduct any meaningful investigation into Plaintiffs' grievances.

52.     Instead, Shellpoint continued to pound Plaintiffs with written correspondences and collection calls alleging that the Loan was in default.

53.     Importantly, during Plaintiffs conversations with Shellpoint, Plaintiffs requested and were grantedCOVID-19 Relief accommodations.

54.     As part of the accommodations, Shellpoint agreed to refrain from credit reporting any delinquencies on the Loan pursuant to the CARES Act.[2]

55.     Despite Shellpoint's representations that it would not credit report any delinquencies, Shellpoint started to unlawfully and inaccurately report the Loan as delinquent in violation of the CARES Act.

56.     In early 2021, after Shellpoint repeatedly refused to fix its servicing errors, Plaintiffs retained counsel in an effort to compel Shellpoint to fix its servicing errors.

57.     In early 2021, Plaintiffs' counsel sent a Qualified Written Request and Notice of Error ("QWR") pursuant to RESPA to Shellpoint.

58.     The QWR (1) notified Shellpoint of its servicing errors; (2) requested that Shellpoint fix its servicing errors (e.g. erroneous opening of escrow account and derogatory credit reporting in contravention of the CARES Act); and (3) requested information relating to the Loan, including the loan history and escrow charges.

59.     On May 7, 2021, Shellpoint responded to the QWR.

60.     Shellpoint's response falsely stated that (1) the escrow account was properly opened pursuant to the terms of Loan due to Plaintiffs' failure to timely make the real estate tax payments; and (2) Shellpoint did not report any delinquencies on Plaintiffs' credit reports.

61.     Shellpoint's response also (1) requested that Plaintiffs "submit documentation" to support their contention that the real estate tax payment deadlines were extended by Cook County;

---

[2] The CARES Act was passed by Congress in March 2020 in an effort to help American families and businesses offset the crippling economic impact of the COVID-19 pandemic. Pursuant to the CARES Act, Shellpoint was temporarily prohibited from credit reporting any delinquencies on Plaintiffs' credit reports.

(2) stated that if Plaintiffs submit the documentation, Shellpoint would send the same to its "tax department for review"; and (3) failed to provide Plaintiffs with all the information requested in the QWR.

62.     On May 19, 2021, Plaintiffs' counsel sent Shellpoint a correspondence that (1) included documentation establishing that Cook County extended the real estate tax payment deadlines; and (2) requested documentation from Shellpoint establishing that Plaintiffs failed to timely pay their real estate taxes.

63.     Despite Plaintiffs' counsel's intervention and attempts to compel Shellpoint to cure its servicing errors, Shellpoint failed to remove the escrow account, deem the Loan current, and/or correct its credit reporting to comply with the CARES Act.

64.     Instead, Shellpoint continued sending Plaintiffs written correspondences that falsely alleged that the Loan was in default.

65.     On April 20, 2022, Plaintiffs sent another QWR pursuant to RESPA to Shellpoint requesting, *inter alia*, (1) a payment history; (2) application of payment history; and (3) an itemization of escrow charges on the Loan and the basis for the same.

66.     On May 4, 2022, Plaintiffs submitted a complaint to the Consumer Financial Protection Bureau ("CFPB") complaining of Shellpoint's unfair conduct, including the erroneous opening of the escrow account, inaccurate credit reporting, and assessment of erroneous charges to the Loan.

67.     On May 20, 2022, Shellpoint responded to Plaintiffs' CFPB Complaint.

68.     Shellpoint's response stated that Shellpoint (1) properly opened the escrow account pursuant to the terms of the Loan due to Plaintiffs' failure to timely make their real estate tax

payments to Cook County; (2) is accurately reporting the Loan; and (3) did not make any servicing errors with respect to the Loan.

69.     Remarkably, Shellpoint's response further stated that it was holding $1,300 in "unapplied funds" in a suspense account; ironically highlighting its incompetent servicing of the Loan as the $1,300 it was admittedly holding in the suspense account was sufficient to satisfy one full payment of $1,081.85.

70.     On July 1, 2022, after exercising multiple extensions due to the "complex" nature of Plaintiffs' QWR, Shellpoint responded to Plaintiffs' QWR.

71.     Shellpoint's response to Plaintiffs' QWR did not provide Plaintiffs with all the documents/information requested in Plaintiffs' QWR. Instead, Shellpoint contended that the information requested in the QWR was "overly broad" or "[does] not fall within the scope of a Qualified Written Request."

72.     Shellpoint's response further stated that the Loan is approximately one year past due and that Shellpoint was holding $1,300 in an "unapplied funds" in a suspense account and that the funds would remain in the suspense account until the amount is sufficient to satisfy one full payment.

73.     Shellpoint's response to the QWR was another ironic example of its sloppy and incompetent servicing of the Loan as the funds held in the suspense account were sufficient to satisfy one full payment of $1,081.85.

74.     On August 4, 2022, Shellpoint sent Plaintiffs an "Annual Escrow Account Disclosure Statement" ("Escrow Account Disclosure").

75. Remarkably, despite Shellpoint's repeated contentions that the Loan was past due and in default, the Escrow Account Disclosure stated that as of September 19, 2022, there is an **escrow surplus of $10,439.70**.

76. The Escrow Account Disclosure further stated that the escrow payment effective September 19, 2022 will be $0.00, therefore implying that Shellpoint was finally closing the escrow account it erroneously opened.

77. After Plaintiffs received the Escrow Account Disclosure indicating a large escrow surplus, Plaintiffs started receiving correspondences from Shellpoint implying that Shellpoint will be initiating foreclosure proceedings against Plaintiffs and the Property.

78. From the date Shellpoint began servicing the loan through the present, 44 payments of $1,081.85 have become due, totaling $47,601.40 (44 months x $1,081.85).

79. From the date Shellpoint began servicing the loan through the present, Plaintiffs have made a total of $50,307.93 in payments to Shellpoint.

80. Despite the fact that Plaintiffs have made more payments than they were contractually required to from June 2019 through the present, Shellpoint failed to apply Plaintiffs' payments pursuant to the terms of the Loan.

81. Specifically, at the time Shellpoint began servicing the Loan, the balance on the Loan was $218,848.44. The September 2022 mortgage statement sent by Shellpoint alleges that the balance of the Loan was $217,268.87.

82. As demonstrated by basic mathematics and Shellpoint's most recent mortgage statement, Shellpoint failed to adequately apply Plaintiffs' payments to principal.

83. Astonishingly, the September 2022 mortgage statement reflected that the "current escrow balance" was $1,699.01; in direct conflict with Shellpoint's August 4, 2022 Escrow

Account Disclosure, which indicated (1) an *escrow surplus of $10,439.70*; and (2) that no further escrow payments will be due effective September 19, 2022.

## Credit Reporting Disputes

84.     From 2021 through the present, Plaintiffs submitted multiple disputes to the CRAs challenging Shellpoint's inaccurate credit reporting of the Loan ("Plaintiffs' disputes").

85.     Specifically, Plaintiffs' disputes challenged Shellpoint's reporting the status of the Loan as delinquent. As set forth extensively above, the escrow account was erroneously opened by Shellpoint and Plaintiffs made all principal and interest payments that became due on the Loan. Accordingly, Shellpoint's reporting to the CRAs that the Loan was delinquent was misleading and inaccurate.

86.     Plaintiffs' disputes further challenged Shellpoint's credit reporting that was in contravention of the CARES Act.

87.     Upon information and belief, the CRAs sent Plaintiffs' disputes to Shellpoint. *See* 15 U.S.C. §1681i(a)(2).

88.     To Plaintiffs' dismay, Shellpoint and the CRAs failed to conduct a reasonable investigation into Plaintiffs' disputes.

89.     Specifically, in response to Plaintiffs' disputes, Shellpoint and the CRAs erroneously "verified" that Shellpoint's credit reporting was accurate when it was objectively inaccurate.

90.     As a result of Shellpoint and the CRAs' failure to conduct a reasonable investigation into Plaintiffs' disputes, Shellpoint and the CRAs continued to inaccurately report the Loan as past due on Plaintiffs' credit reports.

## DAMAGES

91.     Plaintiffs lived a happy and fulfilling life until Shellpoint entered their lives in June 2019.

92.     Shellpoint's conduct has severely disturbed Plaintiffs' daily lives and general well-being.

93.     As a result of Shellpoint's unfair and unconscionable conduct, Plaintiffs have and continue to suffer significant damages.

94.     As a result of Shellpoint's conduct, Plaintiffs have suffered financial harm. Specifically, Shellpoint repeatedly assessed erroneous late fees and other default charges to the Loan (e.g. property inspection fees, etc.), therefore increasing the balance of the Loan and decreasing Plaintiffs' equity in the Property.

95.     In addition to financial harm, Plaintiffs suffered and continue to suffer agonizing emotional distress, anxiety, and mental anguish as a result of Shellpoint's reprehensible conduct.

96.     Shellpoint's conduct has strained Plaintiffs' marriage as Shellpoint's unfair and unconscionable conduct has caused Plaintiffs to be perpetually stressed, irritable, and aggravated, thus adversely effecting Plaintiffs' day-to-day relations with each other.

97.     Moreover, the inaccurate credit reporting of the Loan devastated and continues to devastate Plaintiffs' creditworthiness because it creates a false impression that Plaintiffs defaulted on the Loan, therefore rendering Plaintiffs as high-risk consumers and damaging their ability to obtain credit.

98.     As a result of Shellpoint's conduct, Plaintiffs have been denied credit and credit opportunities.

99.     As a result of Shellpoint's conduct, Plaintiffs have lost hundreds of hours dealing with Shellpoint's mishandling of the Loan.

100.    As a result of Shellpoint's conduct, Plaintiffs have lived and continue to live in perpetual fear of losing their home in a foreclosure.

101.    As a result of Shellpoint's conduct, Dawn's mental and physical health have deteriorated and have required medical attention.

102.    As a result of Shellpoint's conduct, Plaintiffs were forced to retain counsel on multiple occasions, therefore incurring attorney's fees and costs.

### COUNT I –
### BREACH OF CONTRACT
### (Plaintiffs against Shellpoint)

103.    All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

104.    The Loan/Mortgage is a valid and enforceable contract between Plaintiffs and BMO and its successors and assigns ("Contract").

105.    Shellpoint, as the servicing agent for the current owner of the Loan, is a successor and/or assignee of the Loan and Mortgage and is therefore bound by the terms of the Contract.

106.    Plaintiffs performed their duties under the Contract by (1) tendering all principal and interest payments required by the Contract; and (2) complying with all of the other terms of the Contract.

107.    Under Illinois law, every contract implies a covenant of good faith and fair dealing.

108.    Shellpoint materially breached the contract by:

    a. unilaterally paying Plaintiffs' real estate taxes prior to the due date;

    b. opening an escrow account without any factual or contractual basis;

    c. opening an escrow account without any notice to Plaintiffs;

14

    d.  charging the costs of the forced-placed escrow account to the Loan;

    e.  deeming the Loan in default when it was current;

    f.  erroneously alleging an escrow shortage without proper notice to Plaintiffs;

    g.  misapplying Plaintiffs' payments by holding the payments in suspense and not timely applying the payments per the terms of the Loan and Mortgage;

    h.  charging bogus late fees to the Loan  when Plaintiffs were contractually current on the Loan;

    i.  charging bogus default fees to the Loan;

    j.  failing to close the escrow account upon notice it was opened without factual or contractual basis; and

    k.  failing to deal with Plaintiffs in good faith.

109.    As stated above, Shellpoint's breach of contract has caused Plaintiffs significant economic and non-economic damages.

**WHEREFORE,** Plaintiffs respectfully request the following relief:

    a.    A judgment in Plaintiffs' favor and against Shellpoint for breach of contract;

    b.    An award of compensatory damages; and

    c.    Any further relief the Court deems just and proper.

### COUNT II –
### VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT ("ICFA")
### (Plaintiffs against Shellpoint)

110.    All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

111.    Plaintiffs are each a "person" as defined by 815 ILCS 505/1(c).

112.    Plaintiffs are each a "consumer" as defined by 815 ILCS 505/1(e).

113.    Shellpoint is engaged in "commerce" as defined by 815 ILCS 505/1(f).

114.    Section 2 of the ICFA provides:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false, pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived, or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to section 5(a) of the Federal Trade Commission Act.

**a.      Unfairness and Deception**

115.    Defendants' comprehensive conduct as set forth above is objectively unfair and deceptive.

116.    It was unfair and deceptive for Shellpoint to:

a.   unilaterally pay Plaintiffs' real estate taxes prior to the due date;

b.   open an escrow account without any factual or contractual basis;

c.   open an escrow account without any notice to Plaintiffs;

d.   charge the costs of the forced-placed escrow account to the Loan;

e.   deem the Loan in default when it was current;

f.   misapply Plaintiffs' payments by holding the payments in suspense and not timely applying the payments per the terms of the Loan and Mortgage;

g.   charge bogus late fees and default fees to the Loan when Plaintiffs were contractually current on the Loan;

h.   repeatedly refuse to close the escrow account despite having actual knowledge that the escrow account was opened in error;

    i.    repeatedly fail to investigate Plaintiffs' contentions that the escrow account was opened without a factual or contractual basis;

    j.    credit report the Loan in contravention of the CARES Act;

    k.    refuse to correct its inaccurate credit reporting of the Loan;

    l.    fail to investigate the allegations in Plaintiffs' CFPB complaint; and

    m.    fail to deal with Plaintiffs in good faith.

117.    Plaintiffs had no choice but to submit to Shellpoint's unfair and deceptive conduct as Plaintiffs had no control over the escrow account and how Shellpoint was applying their payments.

118.    Shellpoint intended for Plaintiff to rely on its unfair and deceptive acts and Plaintiff in fact relied on the false representations by paying the fictitious and unauthorized charges assessed to the Loan.

119.    As pled above, Plaintiffs were significantly harmed by Shellpoint's conduct.

120.    Shellpoint's overall conduct as described herein is objectively unfair and against public policy because it results in monetary loss to consumers as their loans are unfairly driven into default and they are forced to pay erroneous charges to avoid their homes from being foreclosed on.

121.    Shellpoint's conduct is against public policy because:

    a.    it results in monetary loss to consumers;

    b.    it is driven by greed and results in profits to Shellpoint at the consumers' expense;

    c.    consumers reasonably expect their mortgage company to not force-place escrow on non-escrowed loans at the consumers' expense;

    d.    consumers reasonably expect their mortgage company to not collect amounts it was not entitled to;

e.  consumers reasonably expect their mortgage company to not overstate the amounts owed on their loans;

f.  consumers reasonably expect their mortgage company to communicate with them truthfully regarding the status of their loans;

g.  consumers reasonably expect their mortgage company to investigate their disputes/grievances in good faith;

h.  consumers reasonably expect their mortgage company to credit report the status of their mortgage loans in compliance with the CARES Act;

i.  consumers reasonably expect their mortgage company to comply with laws designed to protect consumers; and

j.  consumers reasonably expect their mortgage company to follow state and federal law and their own guidelines.

122.    Shellpoint's conduct as described above is part of a pattern and practice in which Shellpoint routinely engages in as part of its business model.

123.    Specifically, Shellpoint has been repeatedly sued by State Attorney Generals across the United States for engaging in unfair conduct similar to the conduct complained of herein.

124.    Shellpoint mistreats consumers on a wide scale and its unlawful conduct has been publicized and condemned.

125.    Despite lawsuits filed by consumers and State Attorney Generals, Shellpoint brazenly continues to mistreat consumers nationwide.

126.    Accordingly, an award of punitive damages is appropriate because Shellpoint's conduct towards Plaintiffs was willful, wanton, and demonstrates a reckless disregard for the rights of Plaintiffs and Illinois consumers in general.

127.    Additionally, an award of punitive damages is appropriate to deter Shellpoint from future misconduct.

**WHEREFORE,** Plaintiffs request the following relief:

    a. A judgment in Plaintiffs' favor and against Shellpoint for violations of ICFA;

    b. An award of actual damages;

    c. An award of punitive damages;

    d. An award of reasonable attorney's fees and costs; and

    e. Any further relief deems just and proper.

**COUNT III –**
**VIOLATIONS OF THE FAIR CREDIT REPORTING ACT**
**(Plaintiffs Against Shellpoint)**

128. All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

129. Plaintiffs are each a "consumer" as defined by 15 U.S.C. §§1681a(b) and (c).

130. Plaintiffs are each a "person" as defined by 15 U.S.C. §1681a(b).

131. Shellpoint is a "furnisher of information" as defined by 15 U.S.C. §1681s-2 and a "financial institution" as defined by 15 U.S.C. §1681a(t).

132. At all times relevant, the above mentioned credit reports were "consumer reports" as the term is defined by §1681a(d)(1).

133. Shellpoint violated 15 U.S.C. §1681s-2(b)(1)(A) by failing to conduct a reasonable investigation into each of Plaintiffs' disputes submitted by Plaintiffs to the CRAs.

134. Shellpoint violated 15 U.S.C. §1681s-2(b)(1)(B) by repeatedly failing to review all relevant information included in Plaintiffs' disputes to the CRAs.

135. Had Shellpoint taken any meaningful steps to investigate Plaintiffs' valid disputes, it would have determined that the Loan was erroneously reporting (1) as past due when in fact the Loan was contractually current; and (2) in contravention of the CARES Act.

136.   As set forth above, Shellpoint's credit reporting was inaccurate as Plaintiffs made all payments that were required by the Loan.

137.   Shellpoint violated 15 U.S.C. §§1681s-2(b)(1)(C) and (D) by failing to report the results of its investigations to the CRAs after being put on notice and discovering that it was reporting inaccurate and misleading information pertaining to the Loan.

138.   Shellpoint violated 15 U.S.C. §1681s-2(b)(1)(E) by failing to modify, delete, or permanently block its inaccurate credit reporting of the Loan after receipt of Plaintiffs' disputes.

139.   Shellpoint violated 15 U.S.C. §1681s-2(a)(3) by failing to report that Plaintiffs disputed the accuracy of Shellpoint's reporting of the Loan to the CRAs.

140.   Despite being on notice of its erroneous credit reporting of the Loan, and Plaintiffs' efforts to correct the errors, Shellpoint repeatedly refused to correct its erroneous credit reporting. Instead, Shellpoint repeatedly furnished and re-reported inaccurate and misleading information regarding the Loan to the CRAs.

141.   Any reasonable investigation by Shellpoint would have confirmed that (1) the Loan was not past due; and (2) that Shellpoint's credit reporting was in contravention of the CARES Act.

142.   Had Shellpoint taken any meaningful steps to investigate Plaintiffs' valid disputes, it would have permanently corrected its false credit reporting. Plaintiffs provided supporting information in their disputes, yet Shellpoint repeatedly ignored the supporting evidence and continued its false reporting of the Loan.

143.   By deviating from the standards established by the credit industry and the FCRA, Shellpoint acted with reckless and willful disregard for its duty as a furnisher to report accurate and complete consumer credit information to the CRAs.

144.     Shellpoint has exhibited a pattern of refusing to correct credit reporting errors despite being on notice that the its false credit reporting is wreaking havoc on consumers' credit scores, ultimately valuing its own bottom line above its grave responsibility to report accurate data to the CRAs.

145.     As set forth above, Plaintiffs were significantly harmed by Shellpoint's repeated inaccurate credit reporting of the Loan.

**WHEREFORE,** Plaintiffs request the following relief:

   a.   A judgment in favor of Plaintiffs and against Shellpoint for violations of the FCRA;

   b.   An award of actual damages;

   c.   An award of punitive damages;

   d.   An award of reasonable attorney's fees and costs; and

   e.   Any further relief the Court deems just and proper.

**COUNT IV**
**VIOLATIONS OF THE FAIR CREDIT REPORTING ACT**
**(Plaintiffs Against Experian, Equifax, and Trans Union)**

146.     All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

147.     The CRA Defendants are each a ""consumer reporting agency" as defined by 15 U.S.C. §1681a(f).

148.     The CRA Defendants are each a "consumer reporting agency that compiles and maintains files on consumers on a nationwide basis" as defined by 15 U.S.C. §1681a(p).

149.     At all times relevant, the above mentioned credit reports were "consumer reports" as that term is defined by §1681a(d).

150. The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b)

151. The FCRA requires the CRA Defendants to implement procedures and systems to promote accurate credit reporting.

152. If a consumer notifies a credit reporting agency of a dispute concerning the accuracy of any item of credit information, the FCRA requires the credit reporting agency to conduct a reasonable investigation to determine whether the disputed information is inaccurate and record the current status of the disputed information or delete the disputed information within 30 days of receiving the dispute. 15 U.S.C. §1681i(a)(1)(A).

153. The CRA Defendants failed to conduct reasonable investigations into Plaintiffs' disputes. Instead, they continued to blindly report the false information provided to them by Shellpoint.

154. The CRA Defendants violated 15 U.S.C. §1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in preparation of the consumer reports it furnished and refurnished concerning Plaintiffs. Upon information and belief, the CRA Defendants distributed patently false and materially misleading consumer reports concerning Plaintiffs to third parties.

155. The CRA Defendants failed to follow reasonable procedures to assure maximum possible accuracy by ignoring the merits of Plaintiffs' disputes and blindly accepting Shellpoint's erroneous reporting as accurate.

156. Had the CRA Defendants followed reasonable procedures to assure maximum possibly accuracy, they would have conducted a meaningful investigation into Plaintiffs' disputes

and promptly discovered that the information that Shellpoint was reporting was erroneous. Instead, the CRA Defendants repeatedly accepted Shellpoint's erroneous and damaging information as true and continued their reporting of the erroneous information.

157.    The CRA Defendants should have implemented procedures and safeguards to avoid (1) the blind reliance on false information that is being reported by furnishers such as Shellpoint; and (2) credit reporting information in contravention of the CARES Act.

158.    The CRA Defendants violated 15 U.S.C. §1681i(a)(1) by failing to (1) conduct a reasonable investigation into Plaintiffs' disputes; and (2) delete the inaccurate information from Plaintiffs' credit files.

159.    Had the CRA Defendants conducted reasonable investigations into Plaintiffs' valid disputes, they would have promptly determined that the Loan was reporting inaccurately.

160.    The CRA Defendants took no meaningful steps to determine whether the information Shellpoint was reporting was accurate and reliable. Instead, the CRA Defendants blindly reported any information that Shellpoint was reporting with no regard to its accuracy.

161.    At very minimum, the CRA Defendants should have requested that Shellpoint provide proof that its credit reporting of the Loan was accurate. Instead, the CRA Defendants continued to recklessly report false and unreliable information regarding the Loan.

162.    The CRA Defendants violated 15 U.S.C. §1681i(a)(2) by failing to provide adequate notification of Plaintiffs' disputes to Shellpoint. Upon information and belief, the CRA Defendants may have failed to convey all relevant information provided to the CRA Defendants by Plaintiffs to Shellpoint.

163.    The CRA Defendants violated 15 U.S.C. §1681i(a)(4) by failing to review and consider all relevant information that it received from Plaintiffs with regard to the Loan.

164.    The CRA Defendants violated 15 U.S.C. §1681i(a)(5) by failing to delete or modify the inaccurate information that was the subject of Plaintiffs' disputes.

165.    The CRA Defendants violated 15 U.S.C. §1681c(f) by failing to notate that Plaintiffs disputed the reporting of the Loan. The CRA Defendants are required to notate each account that a consumer disputes as "disputed" in each consumer report that includes the disputed information.

166.    After receiving Plaintiffs' disputes, the CRA Defendants knew or should have known that Shellpoint's credit reporting of the Loan was inaccurate and should have taken action to correct the disputed information as required by the FCRA.

167.    The CRA Defendants readily distributed Plaintiffs' inaccurate and misleading credit reports to one or more third parties, thereby misrepresenting facts about Plaintiffs and Plaintiffs' creditworthiness.

168.    By deviating from the standards established by the credit reporting industry and the FCRA, the CRA Defendants acted with a reckless disregard for their duties to report accurate and complete consumer credit information.

169.     It is the CRA Defendants' regular business practice to blindly report disputed information without taking the required investigatory steps to meaningfully verify such information as accurate.

170.    The CRA Defendants' non-compliance with the requirements of the FCRA is indicative of the reckless, willful, and wanton nature of their mistreatment of Plaintiffs.

171.    The CRA Defendants have exhibited a pattern of refusing to correct errors in consumer credit files despite being on notice of patently false and materially misleading

information contained in such files, ultimately valuing their own bottom line above their grave responsibility to report accurate consumer data.

172. As stated above, Plaintiffs were significantly harmed by the CRA Defendants' conduct.

**WHEREFORE**, Plaintiffs request the following relief:

a. A judgment in favor of Plaintiffs and against the CRA Defendants for violations of the FCRA;

b. An award of actual damages;

c. An award of punitive damages;

d. An award of reasonable attorney's fees and costs; and

e. Any further relief the Court deems just and proper.

**COUNT V –**
**VIOLATIONS OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT**

173. All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

174. Shellpoint's conduct as set forth above is part of a pattern and practice in violation of Plaintiffs' rights and in contravention of Shellpoint's obligations under the mortgage servicing regulations set forth in Regulation X of RESPA.

175. At the time of the filing of this Complaint, consumers, nationally, have lodged over thousands of complaints with the CFPB against Shellpoint for issues relating to Shellpoint's mortgage servicing errors and/or misconduct, including complaints of Shellpoint's failure to comply with its obligations under RESPA.

### a. Violations of §1024.36(d)

176. Pursuant to §1024.36(d) of RESPA (Regulation X), a mortgage servicer is required to respond to a borrower's request for information and/or QWR by providing the borrower with the requested information within 30 days. 12 C.F.R. §1024.36(d).

177. Shellpoint violated §1024.36(d) of RESPA by failing to provide Plaintiffs with all the information requested in Plaintiffs' QWRs to Shellpoint.

### b. Violations of §1024.17(f)(2)(i)

178. Pursuant to §1024.17(f)(2)(i) of RESPA (Regulation X), a mortgage servicer is required to refund an escrow surplus to the borrower within 30 days from the date of the escrow analysis provided the surplus exceeds $50.00. 12 C.F.R. §1024.17(f)(2)(i).

179. Shellpoint violated §1024.17(f)(2)(i) of RESPA by failing to refund Plaintiffs the escrow surplus of $10,439.70 within 30 days of the Escrow Disclosure Statement.

180. To date, Shellpoint has not issued an escrow surplus refund to Plaintiffs.

**COUNT VI-**
**<u>VIOLATIONS OF THE TRUTH IN LENDING ACT</u>**

181. All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

182. Pursuant to 15 U.S.C. §1639f(a) and 12 C.F.R. §1026.36(c)(1)(i), a mortgage servicer shall credit a full payment to the consumer's loan account as of the date of receipt.

183. Pursuant to 12 C.F.R. §1026.41(1)(ii)((B), a mortgage servicer must apply to a mortgage loan any amounts in a suspense account that are sufficient to cover one full payment.

184. Shellpoint violated 15 U.S.C. §1639f(a) and C.F.R. §1026.36(c)(1)(i) by failing to credit Plaintiffs' full payments as of the date of receipt.

185.    Shellpoint violated 12 C.F.R. §1026.41(1)(ii)((B) by failing to apply funds in the suspense account that satisfied one full payment to the Loan.

186.    Specifically, as set forth above, instead of promptly crediting Plaintiffs' full payments to the Loan, Shellpoint repeatedly held the payments in a suspense account despite the fact that the amount in the suspense account was sufficient to satisfy one full payment.

187.    As set forth above, Plaintiffs were significantly harmed by Shellpoint's conduct.

**WHEREFORE,** Plaintiffs request the following relief:

a.      A judgment in favor of Plaintiffs and against Shellpoint for violations of TILA;

b.      An award of actual damages;

c.      An award of statutory damages;

d:      An award of reasonable attorney's fees and costs;

e.      An award of any further relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.

Dated: October 31, 2022                          Respectfully Submitted,

/s/ *Mohammed O. Badwan*

Mohammed O. Badwan
Sulaiman Law Group, Ltd.
2500 S. Highland Ave., Ste. 250
Lombard, IL 60148
Phone (630) 575-8180
mbadwan@sulaimanlaw.com
*Counsel for Plaintiffs*